## SPRENGER v BICKLE

Docket No. 310599. Submitted May 16, 2013, at Traverse City. Decided
September 10, 2013, at 9:00 a.m. Leave to appeal sought.

John C. Sprenger filed an action in the Benzie Circuit Court against
Emily R. Bickle, seeking a determination of his paternity of the
minor child under the Paternity Act, MCL 722.711 *et seq.*, legal
and physical custody, parenting time, and child support. Plaintiff
alleged that he had been engaged to defendant for a period of time
after her divorce from Adam Bickle in April 2011, that plaintiff
and defendant had announced soon after the divorce that defen-
dant was pregnant with plaintiff's child, that the engagement had
ended, and that defendant had remarried Adam Bickle in August
2011. Plaintiff claimed that he was the biological father of the
minor child born to defendant in November 2011 while she was
married to Adam Bickle. The circuit court, Nancy Ann Kida, J.,
granted defendant's motion to dismiss pursuant to MCR
2.116(C)(5), concluding that plaintiff lacked standing to bring the
action. Plaintiff appealed.

The Court of Appeals *held*:

1. Only the mother and the presumed legal father may chal-
lenge the presumption of legitimacy of a child born during their
marriage. Under the Paternity Act, a third party has standing to
rebut the presumption of legitimacy only if there has been a prior
judicial determination arising from a proceeding between the
husband and wife that declares the child is not the product of the
marriage. In this case, because defendant and her husband, Adam
Bickle, had not requested a judicial determination that the child
was born out of wedlock, the trial court properly determined that
plaintiff lacked standing under the Paternity Act to claim pater-
nity of the child.

2. Because plaintiff lacked standing to bring an action under
the Paternity Act, he was not entitled to discovery to assist in
developing that paternity claim and the trial court properly denied
plaintiff's motion for discovery. Whether Adam Bickle had a
vasectomy before defendant became pregnant with the minor child
was not relevant because Bickle was married to defendant at the

time the child was born and neither Bickle nor defendant had sought a judicial determination challenging the presumption of legitimacy.

3. When both parents in a divorce proceeding identify one child as the issue of their marriage, but acknowledge that another child was not, that divorce judgment is considered to have determined the issue of paternity of both the children. In this case, although defendant was most likely pregnant with the minor child at the time of defendant and Adam Bickle's April 2011 judgment of divorce, the pregnancy was not identified in the judgment. Even though the Bickles' other children were identified by name in the judgment, it was still presumed that Adam Bickle was the minor child's legal father because he was born after the couple had remarried and neither defendant nor Adam Bickle had filed an action to rebut the presumption of the child's legitimacy, or specified that Adam Bickle was not the child's father. As a third party, plaintiff lacked standing to request a modification of defendant and Adam Bickle's divorce judgment regarding paternity of the minor child.

Affirmed.

GLEICHER, J., concurring, agreed with the majority opinion, but wrote separately to state that the dissent misapprehended the law and to reiterate that defendant did not have standing to challenge the validity of the Bickles' divorce.

BOONSTRA, J., dissenting, would have reversed the trial court order and remanded for an evidentiary hearing. He would have held that plaintiff had standing to seek an order of paternity under the Paternity Act because the presumption of Adam Bickle's paternity of the child was sufficiently rebutted in the Bickles' April 2011 divorce judgment; the Bickles' knowledge of Adam Bickle's vasectomy, his likely inability to procreate, and identification of three other children of their marriage in the judgment operated as a stipulation in their divorce judgment that the child was not the issue of the marriage. The trial court's decision in the judgment of divorce that the three specified children were the children of the marriage, necessarily means that any child later born to defendant was a child born out of wedlock. If after discovery the evidence demonstrated that Adam Bickle could not have fathered the child or that defendant was not honest in the divorce proceeding about her pregnancy, Judge BOONSTRA would find that defendant had standing.

*Phelps Legal Group, PLC* (by *Eric W. Phelps* and *Kathryn M. Traband*), for John C. Sprenger.

*Law Offices of Paul T. Jarboe* (by *Paul T. Jarboe* and *Lauren K. Pfeil*), for Emily R. Bickle.

Before: Ronayne Krause, P.J., and Gleicher and Boonstra, JJ.

Ronayne Krause, P.J. Plaintiff appeals as of right an order entered on May 18, 2012, dismissing for lack of standing his complaint regarding paternity brought under the Paternity Act. MCL 722.711 *et seq.* We affirm.[1]

I. BASIC FACTS AND PROCEDURAL HISTORY

Plaintiff alleges that he is the biological father of a minor child born to defendant in November 2011, while she was lawfully married to someone else. Plaintiff and defendant were briefly engaged after defendant's divorce from Adam Bickle in April 2011. Although the parties dispute whether defendant was pregnant before her divorce, mutual friends of the couple and members of both their families assert that within days of the divorce, defendant and plaintiff were sharing the news that they were expecting a child. The engagement between plaintiff and defendant ended; in August 2011, defendant remarried Adam and they were still married when she gave birth three months later.

In December 2011, plaintiff filed a paternity action under the Paternity Act, alleging himself to be the biological father of the child and requesting the court to determine issues of legal and physical custody, parenting time, and child support. In response, defendant filed a motion to dismiss, asserting lack of standing, MCR 2.116(C)(5), and failure to state a claim on which relief

---

[1] We publish this case pursuant to MCR 7.215(A). The majority did not request publication.

could be granted, MCR 2.116 (C)(8). In an April 6, 2012 ruling, the circuit court determined that plaintiff did not have standing and granted defendant's motion to dismiss under MCR 2.115(C)(5). This appeal followed.[2]

## II. ANALYSIS

Plaintiff argues that the trial court erred by: (1) finding that plaintiff lacked standing to bring a claim under the Paternity Act because defendant had acknowledged to friends and family that plaintiff was the father of the child she was expecting, which rebutted the presumption of the child's legitimacy, and (2) denying him the opportunity to conduct discovery to prove that it would have been impossible for Adam Bickle to be the father. We disagree.

"This Court reviews the grant or denial of a motion for summary disposition de novo." *Jones v Slick*, 242 Mich App 715, 718; 619 NW2d 733 (2000). "In reviewing a motion for summary disposition pursuant to MCR 2.116(C)(5), this Court must consider the pleadings, depositions, admissions, affidavits, and other documentary evidence submitted by the parties." *Id.* "Statutory interpretation is a matter of law subject to review de novo on appeal." *Rose Hill Center, Inc v Holly Twp*, 224 Mich App 28, 32; 568 NW2d 332 (1997). "If the statutory language is clear and unambiguous, judicial construction is neither required nor permitted, and courts must apply the statute as written." *Id.*

---

[2] Shortly after filing his brief with this Court, plaintiff filed a new action in circuit court under the Revocation of Paternity Act, MCL 722.1431 *et seq.*, which became effective June 12, 2012. The Revocation of Paternity Act gives putative fathers in certain situations standing to bring paternity actions. In this case, we are reviewing decisions made in the context of the Paternity Act only, and our conclusions have no bearing on the action filed under the Revocation of Paternity Act.

Only the mother and the presumed legal father may challenge the presumption of legitimacy. *People v Zajaczkowski*, 293 Mich App 370, 378; 810 NW2d 627 (2011), vacated 493 Mich 6 (2012) (vacating defendant's conviction of first-degree criminal sexual conduct by relying on the plain language of the criminal statute rather than the civil presumption concerning legitimacy). See also *In re KH*, 469 Mich 621, 635; 677 NW2d 800 (2004) (recognizing that only the mother and the legal father may rebut the presumption of legitimacy that arises when a child is born during a marriage). In order for a third party to have standing to rebut this presumption, there must first have been a "judicial determination arising from a proceeding between the husband and the wife that declares the child is not the product of the marriage." *Pecoraro v Rostagno-Wallat*, 291 Mich App 303, 306; 805 NW2d 226 (2011). Letters from friends and family cannot rebut the presumption of legitimacy. In this case, even if blood test results revealed a 99.99% probability that he is the biological father, plaintiff still would not have standing to bring a paternity action absent such a prior judicial determination. *Aichele v Hodge*, 259 Mich App 146, 148, 162; 673 NW2d 452 (2003). Unless and until defendant and her husband ask a court to declare that the child was born out of wedlock, plaintiff lacks standing to claim paternity under the Paternity Act. *Pecoraro*, 291 Mich App at 313.[3] Defendant and her husband have not sought such a judicial declaration; therefore, the trial court was

_____

[3] In *Pecoraro*, the birth mother told the plaintiff that he was the father of a child born during their relationship, while she was married to another man, DNA confirmed his paternity, and a New York court issued an order of filiation declaring him the father of the child that was subsequently enforced by a Wayne Circuit Court. On appeal from the circuit court's decision, this Court found that the plaintiff lacked standing under the Paternity Act because the mother and her husband had not asked a court to declare that the child was born out of wedlock.

correct in determining that plaintiff lacks standing to pursue a remedy under the Paternity Act.

The trial court also correctly denied plaintiff's request for discovery. Because plaintiff does not have standing to *bring* an action under the Paternity Act, he is not entitled to discovery to assist in *developing* a paternity claim.[4] Even if the court had inexplicably allowed discovery, there was no information plaintiff could have discovered through the questions he proposed that would have conferred standing absent a prior judicial determination that the child was not the issue of defendant's marriage.[5]

Plaintiff also argues that the court should vacate or modify defendant's judgment of divorce to address the paternity issue. Plaintiff contends that if defendant knew she was pregnant at the time of her divorce and failed to acknowledge as much to the court, she perpetrated a fraud on the court and the court should vacate the judgment. Alternatively, plaintiff argues that if the court could not address paternity because defendant did not know she was pregnant, the court should address the issue now and modify the judgment accordingly. We disagree.

In support of his argument that the judgment of divorce should be vacated as a fraud on the court, plaintiff relies on *Allen v Allen*, 341 Mich 543; 67 NW2d 805 (1954), and

---

[4] It is true, as the dissent notes, that the majority did not provide authority for its conclusion that because plaintiff lacked standing he was not entitled to discovery. It is axiomatic.

[5] The dissent considers the "controlling consideration" to be "whether the legal father was in fact 'incapable of procreation' at the time of the child's conception." As *Aichele* and *Pecoraro* clearly illustrate, however, biological fatherhood is not the dispositive issue. Regardless of whether defendant's husband had a vasectomy after the birth of their third child, under Michigan law he is the legal father of the child at issue in the instant case and, for purposes of the Paternity Act, remains so until he and the mother seek a judicial determination declaring otherwise.

*DeHaan v DeHaan*, 348 Mich 199; 82 NW2d 432 (1957). In both *Allen* and *DeHaan*, the plaintiff wives became pregnant while separated from their husbands. The courts set aside their judgments of divorce on the basis of fraud. The law under which the Court decided these cases called for the granting of interlocutory decrees of divorce that would become final after a specified period. See *Young v David Young*, 342 Mich 505, 506; 70 NW2d 730 (1955). The marital relationship between the parties did not end until the interlocutory decree became final, and a plaintiff's misconduct during that interlocutory period resulted in his or her loss of the right to an absolute divorce decree. *Linn v Linn*, 341 Mich 668, 673; 69 NW2d 147 (1955); *Curtis v Curtis*, 330 Mich 63, 66; 46 NW2d 460 (1951). Thus at the time *Allen* and *DeHaan* were decided, "a party's marital misconduct was an absolute bar to that party's ability to obtain a divorce. Had the trial court known of plaintiff's misconduct, by law it would have been powerless to grant the divorce." *Rogoski v City of Muskegon*, 107 Mich App 730, 737 n 3; 309 NW2d 718 (1981).

Substantial changes in divorce law since the 1950s render those cases inapplicable to the instant case. But even if *Allen* and *DeHaan* were applicable, plaintiff would not have standing to invoke them because, unlike *Allen* and *DeHaan*, plaintiff was not a party to the instant defendant's divorce.[6] With regard to modifying the judgment of divorce to address the paternity of the child, plaintiff does not have standing to request the court to modify a divorce to which he is not a party. *Berg v Berg*, 336 Mich 284, 288; 57 NW2d 889 (1953) ("[T]he husband and wife are the only parties to be recognized in a divorce case.").

---

[6] The petitioners in *Allen* were actually the trustee of the deceased husband's estate and two heirs-at-law whom the court allowed to join.

Finally, plaintiff argues that defendant's judgment of divorce provided for the custody and care of some of her children but not for the child with whom she was then pregnant. Plaintiff argues that this is tantamount to a judicial determination that the child was not issue of the marriage, which suffices to confer standing under the Paternity Act. We disagree.

In support of his argument to vacate defendant's judgment of divorce, plaintiff cites *Afshar v Zamarron*, 209 Mich App 86; 530 NW2d 490 (1995). Afshar claimed to be the biological father of a daughter conceived and born to Zamarron while she was married to another man. The lower court dismissed Afshar's action for lack of standing. This Court confirmed on appeal that a putative father has standing under the Paternity Act only when a child has been born out of wedlock as defined by the act and also stated that "a divorce judgment that is specific with regard to the question of custody and support of one minor child of the marriage and that is silent with regard to another child may, under appropriate circumstances, be deemed to have determined the issue of paternity." *Id.* at 91-92. *Afshar* may be distinguished from the instant case, however, because in *Afshar*, both Zamarron and her husband had acknowledged in their divorce proceedings that Zamarron's daughter was not issue of their marriage. This mutual acknowledgment by mother and presumed father in the context of judicial proceedings was critical to this Court's conclusion that the determination that the child was not issue of the marriage was implicit in the judgment of divorce.[7] In the instant case, as has been

---

[7] The dissent says "the controlling consideration is not whether the parties to the divorce proceeding expressly made the court aware of the fact that the child was not the issue of the marriage." This is simply untrue. That is precisely the consideration that allowed this Court to conclude in *Afshar* that the determination that the child was not the

repeatedly stated, neither defendant nor the child's legal father has sought to rebut the presumption of the child's legitimacy.

The dissent finds it notable that "[a]t a time when too many fathers are running *from* their parental responsibilities, plaintiff in this case is running *toward* his." This echoes a sentiment expressed nearly a decade ago by this Court in *Spielmaker v Lee*, 205 Mich App, 51; 517 NW2d 558 (1994). In *Spielmaker*, this Court determined that the putative father of a child born two months after the mother's marriage to another man did not have standing under the Paternity Act because the mother was not "not married" during the entire time from conception to birth, and therefore the woman's husband was the child's legal father. *Id.* at 58. The panel observed that "at a time when much criticism is leveled at 'deadbeat dads' who fail to assume responsibility for their children . . . we are faced with a father

issue of the marriage was implicit in the judgment of divorce. The fact that both the mother and the presumed father acknowledged to the court that the child was not issue of the marriage was a necessary prerequisite for the plaintiff to acquire standing under the Paternity Act. *Id.* at 92. The dissent further tries to minimize the crucial significance of the mother and presumed father's admissions by asserting that *Afshar* stands for the proposition that "a biological father could have standing under the Paternity Act where . . . the divorce judgment was specific as to the paternity of one child and silent as to the paternity of another child" and could therefore be a determination that the unmentioned child was not issue of the marriage. What the Court actually held was that this is so "under appropriate circumstances." *Id.* at 91-92. And *Afshar* "presents an example of such circumstances" because both the mother and the presumed father had acknowledged to the court that the child was not issue of the marriage. *Id.* In the instant case, the dissent would construe the court's silence regarding the child at issue as "an affirmative finding" that the child was not issue of the marriage. Presumably, the silence of the parties to the divorce would be construed as a tacit request for the court to declare that the child was born out of wedlock, since such is required before plaintiff could have standing under the Paternity Act. This is illogical.

who wishes to do precisely that yet we are obligated to deny him the opportunity." *Id.* at 59. Rather than contort the law, however, the *Spielmaker* panel did "that which [they were] obligated to do, namely inter-pret[ed] a statute and appl[ied] the statute as written and in light of the precedent set by the Supreme Court." *Id.* The panel expressed its dislike for the result and urged the Legislature to modify the statute. *Id.* at 60.

The Legislature has in fact provided a measure of relief for putative fathers by allowing them to bring paternity claims in certain situations. As mentioned, the lower court dismissed plaintiff's case for lack of standing just weeks before the Revocation of Paternity Act became effective. Plaintiff filed a separate lawsuit under this new act, and that case is still pending. We have not been called upon to decide whether plaintiff has standing under the Revocation of Paternity Act. Rather, this case concerns whether plaintiff has standing under the Paternity Act. The majority holds the trial court correctly determined that he does not.

Affirmed.

GLEICHER, J., concurred with RONAYNE KRAUSE, P.J.

GLEICHER, J. (*concurring*). I fully concur with the majority opinion and write separately only to respectfully respond to the dissent.

The dissent laments that "[a]t a time when too many fathers are running *from* their parental responsibilities, plaintiff in this case is running *toward* his." Plaintiff's virtue aside, an insurmountable obstacle blocks his path to paternity: the minor child already *has* a father. That father is Adam Bickle. Adam and Emily Bickle legally married before the child was born. Their mar-riage created a presumption that Adam fathered the

child. Neither Emily nor Adam ever attempted to rebut
this presumption. And no court has determined that
Adam is not the child's father. These facts resolve this
case, regardless of plaintiff's noble intentions.

Emily and Adam have divorced each other twice and
married thrice. They have three children other than the
involved minor. Relying on statements attributed to
Emily Bickle regarding the date of the involved minor
child's conception, the dissent would hold that "the
presumption of Adam Bickle's paternity of the child was
sufficiently and effectively rebutted in a prior legal
proceeding between defendant and Mr. Bickle to require
further proceedings in the trial court." That legal
proceeding, the dissent asserts, was the Bickle's second
divorce. The dissent theorizes that Emily conceived the
involved child as early as March 27, 2011, less than two
weeks before the *pro confesso* divorce hearing. Accord-
ing to the dissent, Emily may have known that she was
pregnant with plaintiff's child when she testified at the
hearing, and may have committed a fraud on the court
by not revealing her pregnancy.[1] The dissent posits that
because Adam had undergone a vasectomy, Emily's
failure to disclose the pregnancy at the divorce hearing
affords plaintiff with standing to sue under the Pater-
nity Act.

The dissent misapprehends the law. To have standing
to file a paternity action, a plaintiff must "allege that a
'court has determined' that the child was not the issue
of the marriage." *Girard v Wagenmaker*, 437 Mich 231,

---

[1] Most home pregnancy tests are not accurate until more than two
weeks after ovulation, rendering it highly unlikely that Emily knew she
was pregnant by the April 8, 2011 divorce hearing even if she had
conceived on the earliest date postulated by the dissent, March 27, 2011.
See *Home pregnancy tests: can you trust the results?*,
<http://www.mayoclinic.com/health/home-pregnancy-tests/PR00100>
(accessed July 9, 2013).

244; 470 NW2d 372 (1991). "To overcome the strong presumption of the legitimacy of a child born or conceived during a marriage, a court determination must settle with finality a controversy regarding the child's legitimacy." *Barnes v Jeudevine*, 475 Mich 696, 704; 718 NW2d 311 (2006). No court has made any such determination. Emily's post-divorce statements concerning the date of conception are not a substitute for a prior legal proceeding. And Adam's vasectomy (even if he actually had one) possesses no relevance whatsoever.[2] Neither Emily nor Adam ever sought to rebut the presumption that Adam is the child's father. Accordingly, plaintiff lacks standing to do so.

Contrary to the dissent, the facts in this case are not "unique" and do not counsel a creative reinterpretation of the Paternity Act. Plaintiff's story merely echoes *Barnes, Girard* and countless other cases: the spurned lover of a married woman seeks a declaration that he fathered the child born of the affair. As the Supreme

---

[2] The "evidence" of Adam's vasectomy is a statement contained in a letter written by Emily's mother. Needless to say, this "evidence" is pure hearsay. Moreover, even if Adam actually had a vasectomy, he nevertheless could have impregnated Emily. Vasectomy has a failure rate of less than one percent if performed by an experienced doctor, but tests are required afterward to ensure the effectiveness of the procedure. *Vasectomy risks and benefits: what every man should know*, <http://men.webmd.com/features/vasectomy-risks-benefits> (accessed July 9, 2013). In *Foster v Eichler*, 939 SW2d 40 (Mo Ct App, 1997), for example, a father contesting paternity asserted that he had undergone a vasectomy and had three postoperative semen analyses negative for sperm, two before and one after the child's birth. Yet a DNA test identified him as the child's father, which sufficed to support the trial court's paternity ruling.

Moreover, the irrelevance of Adam's alleged vasectomy is not a "sweeping[] assert[ion]" meant to negate the ability of a party with standing to rebut the presumption of legitimacy with evidence of an "incapability of procreation." The dissent misses the point that this ground could have been raised by Adam or Emily, but not by plaintiff.

Court has repeatedly explained, when married parents choose not to explore the paternity of a child born during a marriage, a putative father has no right to meddle with their decision. Children born during a marriage benefit from a "legal regime" that presumes their legitimacy. *In re CAW*, 469 Mich 192, 199; 665 NW2d 475 (2003). "It is likely that these values, rather than failure to consider the plight of putative fathers who wish to invade marriages to assert paternity claims, motivated the drafters of the rules and statutes under consideration." *Id.* at 199-200. Make no mistake, plaintiff seeks to invade a marriage and the dissent would provide him the legal tools to accomplish that invasion.

The dissent asserts that plaintiff's presentation of "clear and convincing evidence" that Adam did not father the child should open the courthouse door to discovery in plaintiff's paternity action. The dissent is incorrect. Plaintiff has no standing to challenge the validity of the Bickles' earlier divorce regardless of any "evidence" that plaintiff may amass. "[T]his Court has been loath to invalidate divorce judgments on the urgings of third parties when neither spouse challenged the validity of the divorce in a direct appeal." *Estes v Titus*, 481 Mich 573, 588; 751 NW2d 493 (2008). Nor is plaintiff empowered to launch an inquisition into whether Emily misrepresented at the *pro confesso* hearing that she was not pregnant: "[T]he Court has refused to invalidate divorces on the basis of third-party allegations of nonjurisdictional irregularities in the divorce proceedings." *Id.* In other words, the validity of the Bickles' divorce is the Bickles' business, not that of plaintiff. And by making a "prior proceeding" a prerequisite to a paternity action, "the Legislature has essentially limited the scope of parties who can rebut the presumption of legitimacy to those capable of address-

ing the issue . . .—the mother and the legal father." *In re KH*, 469 Mich 621, 635; 677 NW2d 800 (2004).

The dissent suggests an exploration of the *pro confesso* divorce proceedings to determine Emily's veracity but provides no details concerning the appropriate scope of such discovery. Should Emily be forced to submit to a polygraph regarding her awareness of the exact date of conception? And why stop there? If plaintiff may explore whether Emily made a misrepresentation, why not evaluate Adam's fertility by ordering him to produce semen for a sperm analysis? Of course, the child would be compelled to undergo a DNA evaluation. Emily's medical records would be fair game for disclosure, as would Adam's. Perhaps expert witnesses could be engaged to opine regarding the date of conception, the accuracy of home pregnancy tests, and the success rate of vasectomies. The specter of an invaded marriage has arrived.

Adam has chosen not to test or renounce his paternity of the involved child. Emily has elected to consider Adam the child's father. This married couple is raising three other children who undoubtedly consider the fourth child their sibling. Adam is the only father the child has ever known. That a court may disrupt this family by issuing discovery orders or ultimately removing the child from his home is nothing short of chilling. It is precisely this scenario that the Legislature intended to avoid by limiting the parties that may challenge a child's paternity to the child's legal parents. Thus, as the majority opinion correctly concluded, plaintiff lacks standing regardless of Emily's statements, the date of her conception, Adam's putative vasectomy, or the fruits of any discovery.

The Legislature and our Supreme Court have placed beyond debate that only a mother or a legal father has

standing to rebut the presumption of paternity. By resting its decision on this tenet, the trial court correctly resolved this case.

BOONSTRA, J. (*dissenting*). At a time when too many fathers are running *from* their parental responsibilities, plaintiff in this case is running *toward* his.[1] He seeks to affirm, under the Paternity Act, MCL 722.711 *et seq.*, his parentage of the minor child. Specifically, he requests genetic testing to establish paternity, joint physical custody of the child (including specified parenting time for plaintiff and defendant), and a determination of support in accordance with the Michigan Child Support Formula.

The trial court dismissed plaintiff's complaint for lack of standing, and the majority affirms. I agree with the majority generally as to the standard for seeking relief under the Paternity Act. However, I disagree, on the unique facts of this case and the current record, that plaintiff lacks standing under the Paternity Act to seek to affirm his parentage of the minor child. More specifically, I believe that the presumption of Adam Bickle's paternity of the child was sufficiently and effectively rebutted in a prior legal proceeding between defendant and Mr. Bickle to require further proceedings in the trial court.[2] I would, however, refrain from making a

---

[1] The majority cites *Spielmaker v Lee*, 205 Mich App 51; 517 NW2d 558 (1994), as echoing a similar sentiment, but as nonetheless interpreting and applying the law as written. Notably, however, *Spielmaker* did not present the issues raised in this appeal, or address the same statutory language or pertinent case law. With due respect to the majority, my analysis and conclusion do not "contort the law," but rather interpret and apply it in a new and unusual factual context.

[2] With due respect to the concurrence, its assertion that this conclusion of the dissent "rel[ies] on statements attributed to Emily Bickle regarding the date of the involved minor child's conception" is

conclusive finding of whether plaintiff rebutted the presumption without the development of a further evidentiary record in the trial court. Accordingly, I dissent from the majority opinion, and would reverse and remand for further proceedings consistent with the reasoning set forth below.

## I. BACKGROUND

The facts of this case are unusual and unique.[3] Defendant is now married for the third time to Mr.

---

simply false. As the discerning reader no doubt will recognize, the concurrence hyperbolically mischaracterizes the dissent's positions in many respects, and then challenges positions that the dissent has not taken, while ignoring those that it has. But this familiar straw-man technique merely serves to substitute misleading rhetorical flair for the intellectually honest debate for which the important issues raised on this appeal cry out, relative to the proper interpretation of the Paternity Act and the case law.

[3] To further its purposes, the concurrence even disputes that the facts of this case are unique, and posits that they "merely echo[]" those of other cases. Really? As the concurrence acknowledges, defendant and Mr. Bickle have "divorced each other twice and married thrice." Between the Bickles' second divorce and third marriage, defendant became engaged to plaintiff. She apparently was carrying plaintiff's child. Mr. Bickle reportedly had a vasectomy years prior to the conception of that child, the fact of which the Bickles were well aware at the time of their second divorce. Before the child's birth, defendant broke off the engagement with plaintiff and instead again remarried Mr. Bickle, just four months after she had divorced Mr. Bickle (for the second time). Defendant's own mother has observed that "[u]nplanned babies seem to encourage unplanned marriages to Adam Bickle which also brings dependency on the welfare system." Defendant denied her own mother (her children's grandmother) further contact with defendant's children. For reasons that are obvious, the concurrence does not explain which of the cited or uncited cases purportedly reflect facts akin to these, or similarly present a situation in which intervening vasectomies, divorces, engagements, and remarriages—in contrast to an out-of-wedlock pregnancy occurring during a single, continuous, procreative marriage—occurred during the course of a pregnancy. The concurrence thus ignores reality to impugn plaintiff as "seek[ing] to invade a marriage" and to falsely

Bickle. Their second divorce was final on April 8, 2011. Prior to the Bickles' second divorce judgment, plaintiff and defendant entered into a relationship that plaintiff maintains resulted in the conception and subsequent birth of the minor child at issue in this case, with whom plaintiff seeks to have a father-son relationship. On April 11, 2011, three days after the final hearing in defendant's second divorce proceeding with Mr. Bickle, defendant told her mother that she was pregnant with plaintiff's child. Defendant also advised others that she was pregnant with plaintiff's child on the basis of the "confirmation" supplied by a pregnancy test taken by plaintiff in the bathroom of a Meijer's store. The date of that pregnancy test is not reflected in the current record, nor is there any evidence in the record as to when defendant began to suspect that she might be pregnant.

Record evidence reflects that Mr. Bickle had a vasectomy after the birth of defendant's third unplanned child in 2009 (prior to his second divorce from defendant), and that he therefore likely could not have conceived the minor child at issue.[4] Plaintiff has sought paternity testing, but it has not been conducted because of the determination below that plaintiff lacked standing under the Paternity Act. Although the evidence suggests that defendant has openly acknowledged plaintiff's paternity of the child, defendant has formally

---

characterize this dissent as seeking to "provide him the tools to accomplish that invasion." The law does not require that we wear such blinders.

[4] The concurrence seeks to marginalize the evidence of Mr. Bickle's vasectomy as "pure hearsay," and thus even characterizes the vasectomy as a "putative" one. Of course, no one has disputed the fact of the vasectomy, the concurrence's characterizations notwithstanding. The concurrence then pads its blindfold by inconsistently denying the very discovery that would definitively answer the question that the concurrence clearly wishes to leave unanswered.

neither admitted nor denied plaintiff's claim of paternity in the course of this litigation.[5]

After defendant's second divorce from Mr. Bickle in April 2011, plaintiff and defendant became engaged, and planned to be married. That marriage did not, however, occur. Instead, defendant and Mr. Bickle married, for a third time, in August 2011. The minor child was born on November 16, 2011, while defendant and Mr. Bickle were again married. The child was born five weeks premature.

Plaintiff's complaint initially alleged—on information and belief—that the minor child was conceived after the April 8, 2011 divorce judgment, and while plaintiff and defendant were engaged. Plaintiff now maintains, however, that the conception occurred prior to the April 8, 2011 divorce judgment, as in fact now appears likely.

It appears that defendant may also have shifted her position with regard to the date of conception. The April 8, 2011 Default Judgment of Divorce, which was prepared by defendant's counsel and entered at defendant's request, provides in part that defendant shall have primary physical custody of the parties' three minor children (not including the then-unborn child at issue in this case), and that defendant and Mr. Bickle shall have joint legal custody of those three minor children. The Judgment of Divorce identifies those three other minor children by name and birthdate, and expressly describes them as "*the* minor children of the parties." (Emphasis added.) This language reflects and constitutes a representation and finding that there were *no other* children of the marriage. See *Afshar v Zamarron*, 209 Mich App 86, 92; 530 NW2d 490 (1995). The parties agree that the Judgment of

---

[5] In lieu of answering plaintiff's complaint in this matter, defendant filed a motion to dismiss pursuant to MCR 2.116(C)(5).

Divorce is silent with respect to any other children, including any conception of, or pregnancy with, the minor child here at issue. The Judgment of Divorce reflects that it was premised in part on defendant's "testimony taken in open Court," which testimony is not before us and appears not to have been before the trial court below. We therefore do not currently have a record of the representations, if any, by defendant at the April 8, 2011 hearing, as to any pregnancy, or lack thereof, as of that date.[6]

Also not before us is evidence of defendant's current position relative to the date of conception. However, plaintiff's counsel has represented, as an officer of this Court, that defendant has submitted evidence in a related proceeding that the conception could only have occurred prior to the April 8, 2011 Judgment of Divorce and, in fact, that the window of conception was from March 27, 2011 to April 3, 2011. Also not in the current record is any evidence of whether defendant knew of, or had reason to suspect, her pregnancy with the child at issue as of the date of the divorce judgment.

### II. STANDARD OF REVIEW

Whether a party has legal standing to assert a claim is a question of law which this Court reviews de novo.

---

[6] MCL 552.45 provides that every complaint for divorce "shall set forth the names and ages of all children of the marriage." Generally, the proofs taken by the trial court at a divorce hearing should include a determination of whether any of the parties is pregnant at the time of the hearing. See *Tyler v Tyler*, 348 Mich 169, 172; 82 NW2d 448 (1957) (holding that the trial court was empowered to vacate a *pro confesso* divorce decree when it became aware that the complainant was pregnant at the time the default judgment was entered and no provision had been made for the child in the judgment); *Allen v Allen*, 341 Mich 543, 551; 67 NW2d 805 (1954) (holding that the complainant's failure to inform the trial court of her pregnancy by a man other than her husband was "a fraud on the court" that justified setting aside the divorce decree).

*Heltzel v Heltzel*, 248 Mich App 1, 28; 638 NW2d 123
(2001). This Court also reviews de novo a trial court's
ruling on a motion for summary disposition, including
one brought pursuant to MCR 2.116(C)(5). *Aichele v
Hodge*, 259 Mich App 146, 152; 673 NW2d 452 (2003).
" 'In reviewing a motion for summary disposition pur-
suant to MCR 2.116(C)(5), this Court must consider the
pleadings, depositions, admissions, affidavits, and other
documentary evidence submitted by the parties.' " *Id.*,
quoting *Jones v Slick*, 242 Mich App 715, 718; 619
NW2d 733 (2000). Our de novo review requires drawing
all inferences in the light most favorable to the plaintiff,
and then determining if the plaintiff established facts
that would give him standing to sue. *McHone v Sos-
nowski*, 239 Mich App 674, 676; 609 NW2d 844 (2000).

### III. HISTORICAL BACKGROUND

As our United States Supreme Court has recognized,
the presumption of legitimacy, as well as its rebuttable
nature, have long been recognized:

> The presumption of legitimacy was a fundamental prin-
> ciple of the common law. H. Nicholas, Adulturine Bastardy
> 1 (1836). *Traditionally, that presumption could be rebutted
> only by proof that a husband was incapable of procreation
> or had had no access to his wife during the relevant period.*
> (citing Bracton, De Legibus et Consuetudinibus Angliae, bk
> i, ch 9, p 6; bk ii, ch 29, p 63, ch 32, p 70 (1569)). [*Michael
> H v Gerald D*, 491 US 110, 124; 109 S Ct 2333; 105 L Ed 2d
> 91 (1989) (emphasis added).]

Subsequent to Bracton's description (in 1569) of the
nature of the proofs required to rebut the presumption
of legitimacy, Lord Mansfield's Rule was announced (as
dicta in an ejectment action) in *Goodright v Moss*, 2
Cowp 591-594; 98 Eng Rep 1257-1258 (1777). See
*Serafin v Serafin*, 401 Mich 629; 258 NW2d 461 (1977).

Lord Manfield's Rule[7] was an evidentiary rule prohibiting a husband and wife from testifying about "nonaccess" to prove the husband's lack of paternity of a child born during the marriage. That rule was "judicially incorporated into the law of this state in *Egbert v Greenwalt*, 44 Mich 245, 248; 6 NW 654; 38 Am Rep 260 (1880)." *Serafin*, 401 Mich at 633. Nearly a century later, our Supreme Court abrogated Lord Mansfield's Rule in *Serafin*. *Id.* at 634 ("We agree that the rule has outlived the policy reasons initially advanced to support it and, finding none others persuasive, we hold that a husband and wife may testify concerning nonaccess to each other."). The Court reiterated, however, that the presumption of legitimacy remained "viable and strong," as well as rebuttable, and held that "clear and convincing evidence" was required to rebut the presumption. *Id.* at 636.

I note, parenthetically, that even the restrictions of Lord Manfield's Rule did not address or undermine the alternative basis traditionally recognized for rebutting the presumption of legitimacy, i.e., "proof that a husband was incapable of procreation." *Michael H*, 491 US at 124 (indirectly citing Bracton). Since the Court in *Serafin* reiterated the rebuttable nature of the pre-

---

[7] Quoting from Goodright, 2 Cowp at 592-594, the *Serafin* court, 401 Mich at 633, set forth Lord Mansfield's Rule:

"[T]he law of England is clear, that the declarations of a father or mother, cannot be admitted to bastardize the issue born after marriage.

\* \* \*

As to the time of the birth, the father and mother are the most proper witnesses to prove it. But it is a rule, founded in decency, morality, and policy that they shall not be permitted to say after marriage, that they have had no connection, and therefore that the offspring is spurious."

sumption, that basis for rebutting the presumption not only has always been a viable one, but it remains so. In addition to abrogating Lord Manfield's Rule, however, the Court in *Serafin* established a "clear and convincing" standard of proof for rebutting the presumption; therefore, any such rebuttal of the presumption by way of evidence that a husband was "incapable of procreation" is subject to *Serafin's* "clear and convincing" standard of proof.

While these principles reflect the presumption of legitimacy and its rebuttable nature, they do not establish *who* is entitled to rebut the presumption, i.e., who has "standing" to contest paternity. The answer to that question instead requires our statutory interpretation of the Paternity Act itself. These long-standing principles nonetheless inform my analysis.

### IV. STANDING

Our Supreme Court has stated that

[t]he purpose of the standing doctrine is to assess whether a litigant's interest in the issue is sufficient to "ensure sincere and vigorous advocacy." Thus, the standing inquiry focuses on whether a litigant "is a proper party to request adjudication of a particular issue and not whether the issue itself is justiciable." [*Lansing Sch Ed Ass'n v Lansing Bd of Ed*, 487 Mich 349, 355; 792 NW2d 686 (2010) (citations omitted).]

A real party in interest is the one who is vested with the right of action on a given claim. *Id.*, citing *Hoffman v Auto Club Ins Ass'n*, 211 Mich App 55, 96; 535 NW2d 529 (1995). " 'Standing does not address the ultimate merits of the substantive claims of the parties.' " *Id.* at 357, quoting *Detroit Fire Fighters Ass'n v Detroit*, 449 Mich 629, 633; 537 NW2d 436 (1995) (opinion by WEAVER, J.).

A plaintiff has standing "whenever there is a legal cause of action." *Lansing Sch Ed Ass'n*, 487 Mich at 372. "Where a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing." *Id.* Standing may be found if "the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant." *Id.*

"A putative father may maintain an action under the Paternity Act only if the child is born out of wedlock." *Afshar*, 209 Mich App at 90. The act defines "child born out of wedlock" as either (1) "a child begotten and born to a woman who was not married from the conception to the date of birth of the child"; or (2) "*a child that the court has determined to be a child born or conceived during a marriage but not the issue of that marriage.*" MCL 722.711(a) (emphasis added). The first prong of this definition is not applicable in this case; rather, plaintiff has standing, if at all, under the second prong.

V. APPLICATION

In applying these principles to the circumstances before us, I conclude that plaintiff likely has standing under the Paternity Act, and would reverse and remand for further proceedings relative to the question of standing. Specifically, I would remand for discovery and an evidentiary *Serafin* hearing to determine: (a) the date of conception of the minor child; (b) whether Mr. Bickle was "incapable of procreation" at that time; (c) defendant's and Mr. Bickle's knowledge of that incapability; (d) the representations to and findings of the trial court in the second divorce proceeding between defendant and Mr. Bickle; and (e) appropriate testing regard-

ing the actual paternity of the child.[8] Further, if those proceedings demonstrate that Mr. Bickle could not have fathered the child in question and/or that defendant was less than fully forthright with the trial court in the divorce proceeding relative to her pregnancy or possible pregnancy, then plaintiff should be found to have standing under the Paternity Act, and his claim should be allowed to proceed.

### A. PRIOR JUDICIAL DETERMINATION

Our Supreme Court determined in *Girard v Wagenmaker*, 437 Mich 231; 470 NW2d 372 (1991), that the judicial determination referred to in the statute was a *prior* determination: "For a putative father to be able to file a proper complaint in a circuit court, . . . a circuit court must have made a determination that the child

---

[8] The majority concludes that because plaintiff does not (in the majority's view) have standing to bring an action under the Paternity Act, he did not have standing to conduct discovery. The majority cites no authority for this conclusion (apart from a bare reference to the discovery subchapter of the Michigan Court Rules), but instead deems it "axiomatic." I would find, to the contrary, that in determining whether plaintiff has standing, plaintiff is first entitled to discovery on the issues that relate to whether he has standing. Generally, a motion for summary disposition is premature when discovery on a disputed issue has not been completed, unless there is no reasonable chance that further discovery will result in factual support for the nonmoving party. *Village of Dimondale v Grable*, 240 Mich App 553, 566; 618 NW2d 23 (2000). Here, I would find that discovery on issues related to standing would have at least a reasonable chance of resulting in factual support for plaintiff, in light of *Afshar* and Justice MARKMAN'S reasoning in *Barnes v Jeudevine*, 475 Mich 696, 714-727; 718 NW2d 311 (2006) (MARKMAN, J., dissenting). As outlined herein, those issues include the date of conception of the minor child, Mr. Bickle's incapability of procreation as of that date, defendant's and Mr. Bickle's knowledge of that incapability, the representations to, and findings of, the trial court in the divorce proceeding between defendant and Mr. Bickle, and appropriate testing to determine the paternity of the child.

was not the issue of the *marriage at the time of filing the complaint." Id.* at 242-243. The requirement of a prior judicial determination was recently reaffirmed in *Pecoraro v Rostagno-Wallat*, 291 Mich App 303; 805 NW2d 226 (2011).[9]

I conclude, under the unique circumstances presented, that plaintiff should be afforded the opportunity to demonstrate that defendant's second divorce judgment from Mr. Bickle satisfies this requirement.[10] The record evidence to date reflects that (a) Mr. Bickle had a vasectomy after the birth of defendant's third child in 2009, and he therefore likely was "incapable of procreation" at the time of the conception of the minor child in question;[11] (b) the trial court in the divorce proceed-

---

[9] The majority relies on *Pecoraro* in maintaining that plaintiff lacks standing "until defendant and her husband ask a court to declare that the child was born out of wedlock." But there are two problems with this expansive reading of *Pecoraro*. First, while *Pecoraro* indeed contains language suggesting that the plaintiff in that case lacked standing because "[the mother] and [her husband] have not asked a court to declare that the child was born out of wedlock," *Pecoraro*, 291 Mich App at 313, the majority's literal reading of that language would require that the mother and her husband have acted *jointly* to request a declaration as to paternity. Second, and more importantly, the point of *Pecoraro* was that the prior proceeding (which there was brought in a New York court for an order of filiation, and to which the legal father was not a party) was not a proceeding *between* the mother and the legal father. It therefore did not satisfy *Girard's* requirement of a prior judicial proceeding between the mother and legal father. Because the proceeding was between defendant and Mr. Bickle, the Bickles' second divorce proceeding does not suffer that deficiency. *Pecoraro* is therefore inapposite.

[10] Notwithstanding the clarity of this language, the concurrence chooses to distort the dissent as if it somehow "misapprehends the law" regarding the prior judicial determination requirement, and is instead seeking a "substitute for a prior legal proceeding." The plain language of the dissent demonstrates otherwise.

[11] The concurrence goes so far as to sweepingly assert that Mr. Bickle's likely incapability of procreation "possesses no relevance whatsoever." This flies in the face of the indisputable fact, as noted, that "incapability

ing made the affirmative determination that three specifically identified children were "the" children of defendant's marriage to Mr. Bickle; (c) this determination was made on the basis of representations by defendant; (d) those representations were not denied by Mr. Bickle; and (e) that determination constitutes a further affirmative determination that there were no other children, born or unborn, of the marriage.[12]

### B. AFSHAR v ZAMARRON

Of all of the cases cited by either the majority, the concurrence, or this dissent, only *Afshar* analogously involved the assessment of a putative father's standing under the Paternity Act where a prior judicial proceeding between the mother and the legal father had in fact made a determination of the issue of the marriage. In *Afshar*, this Court recognized that a biological father could have standing under the Paternity Act when, as

---

of procreation" is one of the two bases for rebutting the presumption of legitimacy that have been recognized in the law from time immemorial, and the one that retained its viability even while Lord Mansfield's Rule prevailed.

[12] In addition to *Pecoraro*, the majority relies on *People v Zajaczkowski*, 293 Mich App 370, 378; 810 NW2d 627 (2011), vacated 493 Mich 6 (2012), and *Aichele*, 259 Mich App at 148, 162; neither is persuasive of the majority's position. Not only did *Zajaczkowski* involve a criminal proceeding, and not only has it been vacated by our Supreme Court, but the prior judicial proceeding in that case had affirmatively determined that the defendant *was* the issue of the marriage in question. That determination stands in stark contrast to the Bickles' second divorce judgment, which expressly did *not* include the unborn child at issue as among "the" children of the Bickles' marriage. The majority's reliance on *Aichele* is also less than compelling. Not only did *Aichele* assess standing under the Child Custody Act, MCL 722.21 *et seq*, rather than the Paternity Act, but its holding importantly was premised on the absence of *any* prior judicial proceeding whatsoever regarding a determination of paternity. It therefore again stands in stark contrast to this case, where the Bickles' second divorce judgment made an express determination of "the" children of the marriage, and the unborn child was not included in that description.

here, the divorce judgment was specific as to the pater-
nity of one child and silent as to the paternity of another
child, and that the divorce judgment may be
deemed—in a proceeding brought by the biological
father—to be a determination that the unmentioned
child was not the issue of the marriage. *Afshar*, 209
Mich App at 92. Similarly, under the unique circum-
stances of this case, I conclude that the divorce judg-
ment between defendant and Mr. Bickle may properly
be deemed a determination that the child in question
was not the issue of their marriage.

The majority distinguishes *Afshar* on the ground
that the mother and legal father in that case had
acknowledged that the unmentioned child was not the
issue of the marriage, and that the trial court in the
divorce proceedings was expressly aware of the child
and of that acknowledgment. See *id*. Indisputably, *Af-
shar* is not on all fours with this case; however, it is
difficult to imagine a case which would be, and I find
*Afshar* nonetheless instructive. To me, the controlling
consideration is not whether the parties to the divorce
proceeding expressly made the court aware of the fact
that the child was not the issue of the marriage. To
place controlling weight on that factor would, in my
mind, potentially reward a lack of candor to the tribu-
nal and exalt form over substance.

Rather, the controlling consideration to me is
whether the legal father was in fact "incapable of
procreation" at the time of the child's conception,
coupled with the parties' knowledge and representa-
tions at the time of the prior divorce proceeding. In this
case, the evidence reflects that Mr. Bickle had a vasec-
tomy after the 2009 birth of another child and therefore
likely was "incapable of procreation" at the time of
conception of the minor child in question. Also relevant

to that consideration, as noted, is whether the parties to the divorce proceeding were aware of that incapability at the time of their representations to the court during that proceeding. The evidence here suggests that defendant likely was aware of Mr. Bickle's incapability at the time of her representations to the court in the divorce proceeding, and it was on the basis of those representations that the court affirmatively found that three specifically identified children (not including the child at issue) were "the" issue of the marriage between defendant and Mr. Bickle. Coupled with the fact of the vasectomy itself (of which Mr. Bickle undoubtedly also had knowledge), Mr. Bickle further confirmed that child's status as "non-issue" of the marriage by failing to refute defendant's representations to the court in the divorce proceeding. Accordingly, defendant's and Mr. Bickle's knowledge—at the time of their divorce—of Mr. Bickle's vasectomy and likely incapability of procreation effectively equates to the stipulation in *Afshar* that the child in question was not the issue of the marriage.[13]

### C. BARNES v JEUDEVINE

I also agree with the logic of Justice MARKMAN's observation in *Barnes v Jeudevine*, 475 Mich 696, 718; 718 NW2d 311 (2006) (MARKMAN, J., dissenting): "The trial court thus concluded, not unreasonably, that no children were born of the marriage of Charles and [the] defendant. As such, the child later born to defendant must, for purposes of the Paternity Act, MCL 722.711(a), have necessarily been a 'child born out of wedlock.' " Similarly, in this case, the trial court's con-

---

[13] Amidst all its hyperbole and distortion, the concurrence nowhere addresses the substance of this or any other of the dissent's conclusions; nor does the majority.

clusion in granting defendant her second divorce judgment from Mr. Bickle, that the three children specifically identified in the divorce judgment were "the" children of the marriage, necessarily means that any other child later born to defendant was a "child born out of wedlock" under the second prong of the statutory definition. This is particularly true given Mr. Bickle's likely incapability of procreation, and defendant's and Mr. Bickle's knowledge thereof at the time of their second divorce judgment.

I recognize, of course, that Justice MARKMAN's observation was made in the dissent in *Barnes*. However, I also find *Barnes* to be distinguishable and, therefore, its majority opinion unpersuasive and nonbinding, in at least two important respects. First, the *Barnes* majority stressed the fact that "[t]he circuit court stated in the judgment of divorce merely that it *appeared* no children were born or expected of the marriage," and that under the clear and convincing evidence standard, "the court's statement that it *appeared* that no children were born or expected of the marriage is not a sufficient court determination that there was a child conceived during the marriage that was not an issue of the marriage." *Barnes*, 475 Mich at 706 (emphasis added). The same cannot be said in this case, because the trial court here affirmatively found three specific children to be "the" children of the marriage between defendant and Mr. Bickle, to the exclusion of any others.

Second, a critical factor exists here that did not exist in *Barnes*, i.e., there is evidence in this case that Mr. Bickle was "incapable of procreation" at the time of the conception of the minor child. Although I would remand for the development of further evidence regarding that factor, I find it hard to conceive of evidence that is more "clear and convincing" of whether a minor child could

be the issue of a marriage. In short, while the presumption of legitimacy remains strong, it fails when "common sense and reason are outraged by a holding that it abides." *Serafin*, 401 Mich at 639 (COLEMAN, J., concurring) (quotation marks and citation omitted).

### D. KNOWLEDGE OF OR REASON TO SUSPECT PREGNANCY

I note parenthetically that my conclusion does not depend on defendant or Mr. Bickle having made misrepresentations to the trial court in the divorce proceeding.[14] That is, if Mr. Bickle indeed was incapable of procreation at the time of conception, and if defendant and Mr. Bickle had reason to know of his incapability at the time of the divorce, I would find that sufficient to deem the divorce judgment to have affirmatively found that the minor child in question was not the issue of the marriage, and thus to afford plaintiff standing, as noted above.

However, my conclusion would find further support in any evidence that might reflect that defendant knew of, or had reason to suspect at the time of her April 8, 2011 *pro confesso* hearing, that she was pregnant with the minor child in question. A complaint for divorce is required to identify the children of the marriage and to state "whether a party is pregnant." MCL 552.45; MCR 3.206(A)(5). Even if a party is not pregnant at the time she files her complaint for divorce, she is obliged to inform the trial court (in the divorce proceedings) of her pregnancy once she becomes aware of it. See *Allen*, 341 Mich at 551. Further, a trial court, even in the context of a default divorce proceeding, has a duty to make findings of fact, see *Koy v Koy*, 274 Mich App 653, 660; 735 NW2d 665 (2007), as well as provide for the care and

---

[14] Again, the concurrence premises its critique of the dissent on it supposedly saying the opposite of what it actually says.

support of the children of the marriage, *Remus v Remus*, 325 Mich 641, 643; 39 NW2d 211 (1949). To that end, courts routinely inquire into whether a party to a divorce is pregnant or has reason to believe she may be pregnant at the time of a *pro confesso* hearing, in order to satisfy these duties. See, e.g., *Allen*, 341 Mich at 551; *Tyler*, 348 Mich at 172; *DeHaan v DeHaan*, 348 Mich 199, 200; 82 NW2d 432 (1957); *Dep't of Social Servs v Carter*, 201 Mich App 643, 644; 506 NW2d 603 (1993).

In this case, this Court has the benefit of neither defendant's complaint for divorce nor a record of the proceedings before the trial court in the divorce action. Presumably, given the routine nature of the inquiries at a *pro confesso* hearing, the trial court made these inquiries of defendant, prior to granting the divorce judgment, including by inquiring into whether she was or may have been pregnant as of the April 8, 2011 hearing date. Although the record of that proceeding is not available to this Court, existing evidence does reflect defendant's knowledge of her pregnancy within no more than three days of her divorce judgment, and further suggests the possibility of her knowledge of, or reason to suspect, her pregnancy prior to the divorce judgment.

In my view, discovery as to defendant's knowledge and representations with regard to her pregnancy is potentially relevant to the question of plaintiff's standing. For example, if defendant did in fact allege or represent to the trial court, prior to its grant of divorce, that she was pregnant, then this case is even more definitively analogous to the circumstances of *Afshar* and its finding that "a divorce judgment that is specific with regard to the question of custody and support of one minor child of the marriage and that is silent with regard to another child may . . . be deemed to have determined the issue of paternity." *Afshar*, 209 Mich App at 91-92.

Alternatively, in the event that discovery were to reveal that defendant was not fully forthright in the divorce proceedings with regard to her pregnancy or possible pregnancy, then I believe that she should not be rewarded by a finding that, as a consequence, plaintiff lacks standing under the Paternity Act.[15] This does not require a finding that plaintiff, as a third-party to the divorce proceedings, has standing to challenge or to seek a modification of the divorce decree.[16] Rather, a lack of candor to the tribunal should serve to estop defendant from denying the accuracy of her representations to the trial court in the divorce proceedings. Under those circumstances, if shown, a representation that she was not pregnant thus may also essentially equate to the stipulation in *Afshar*, thereby deeming the divorce judgment to be a finding that the unborn child was not the issue of the marriage, and further supporting a finding that plaintiff has standing under the Paternity Act.

I therefore would further afford plaintiff a right of discovery into those issues relating to the divorce pro-

---

[15] Our courts have set aside divorce judgments in the past because of fraud perpetrated on the court. See *Allen*, 341 Mich at 551; *DeHaan*, 348 Mich at 200; *Tyler*, 348 Mich at 172. Others faced with a lack of candor have relied on the doctrines of estoppel and unclean hands. See *Sands v Sands*, 192 Mich App 698, 704; 482 NW2d 203 (1992), aff'd, 442 Mich 30 (1993). Although the majority finds *Allen* and *DeHaan* to be "inapplicable on this issue" because of "substantial changes in divorce law since the 1950s," the majority does not identify those changes, or why those changes render the cases inapplicable. But in any event, plaintiff's standing under the Paternity Act does not require that the Bickles' second divorce judgment be set aside or modified. It need only be interpreted, according to its plain language, as identifying only three particular children (not including the unborn child at issue) as "the" children of the marriage.

[16] Again, the concurrence wrongly attacks the dissent for purportedly affording plaintiff standing to "challenge the validity of the Bickles' earlier divorce." The dissent, of course, does nothing of the kind.

ceeding, as they further may bear on the issue of plaintiff's standing, under the unique circumstances of this case and the Paternity Act. I reiterate, however, that if the evidence demonstrates that Mr. Bickle was incapable of procreation at the time of conception, and that defendant and Mr. Bickle had reason to know of his incapability at the time of the divorce, then I would find that evidence sufficient, without regard to whether defendant knew of or suspected her pregnancy as of the date of the divorce judgment, to deem the divorce judgment to have affirmatively found that the minor child in question was not the issue of the marriage, and thus to afford plaintiff standing.[17]

## VI. CONCLUSION

The confluence of the above-discussed factors leads me to conclude that plaintiff likely has standing under the Paternity Act, and that he should be allowed to demonstrate his standing in further trial court proceedings on remand. Specifically, he should be allowed discovery and the opportunity to present proofs at a *Serafin* hearing relative to Mr. Bickle's incapability of procreation at the time of conception, as to defendant's and Mr. Bickle's knowledge of that incapability, and as to the divorce proceedings and the representations of defendant and Mr. Bickle relative to defendant's pregnancy or reason to suspect pregnancy at the time of the divorce. I further would afford to plaintiff, particularly

---

[17] The concurrence attacks the dissent for providing "no details concerning the appropriate scope of discovery," and rolls out a parade of the horribles that the concurrence postulates will occur if any discovery is allowed. Of course, the concurrence not only ignores the parameters that the dissent in fact has placed on the discovery that it would allow, but it further ignores the existence of an elaborate set of court rules controlling the conduct of discovery, and the trial court's authority to exercise its discretion in applying and enforcing those rules.

in light of Mr. Bickle's likely incapability of procreation, an opportunity for appropriate testing to determine the actual paternity of the child.

If after such discovery the evidence demonstrates that Mr. Bickle could not have fathered the child in question or that defendant was less than fully forthright with the trial court in the divorce proceeding relative to her pregnancy or possible pregnancy, then I would find that plaintiff has standing under the Paternity Act, and that his claim should be allowed to proceed.[18]

I therefore respectfully dissent, and would reverse and remand for further proceedings consistent with the reasoning expressed above.

---

[18] The concurrence finds it "chilling" that the dissent would open the door to judicial "disrupt[ion of] this family," including by "ultimately removing the child from his home." To the contrary, the dissent would merely afford plaintiff the opportunity to demonstrate his standing to pursue what his complaint seeks: parenting time and a child support determination.